This Honorable Appellate Court of the 2nd District is back in session. We are soon to adjourn. The Honorable Susan Fayette, Pledge of Allegiance, presiding. Please be seated. Your Honor, the second case in the morning, call 210-1236. People v. Grant. Gambaiani, on behalf of the Appellate, Mr. Elliot Samuels. On behalf of the Appellate, Ms. Sally Strauss. Mr. Samuels, when you're ready. Thank you. May it please the Court and Counsel. Also, Your Honors, if I may, I'm accompanied today by my co-counsel on the brief, Kevin Halverson, seated at the Counsel table. Welcome, sir. Based on the notice we received, I know that the Court is familiar with the facts in the case. Correct. And the issues that we've raised, so I'll try to limit myself as much as possible to points that I think might assist the Court in rendering a decision in this matter. I want to say, first of all, that the appeal raises, obviously, seven major issues and about three sub-issues, all of which call into question the integrity of the verdicts that were rendered in this case in the trial court. Counsel? Yes, ma'am. I have a question on, I think, for me, what is an important issue here. In view of the content of the report that came out during the trial that had not been previously disclosed, in view of the explanation to the jury of the lack of disclosure, and in view of the trial judges giving defense counsel the opportunity to cross-examine the two witnesses who had been called, how would disclosure of the lack of evidence of semen prior to trial have materially affected the outcome of this case? Well, let me answer the question this way. In preparing for this case, Mr. Halverson and myself, we regarded the issue of masturbation in the bedroom to be a side issue in the case. Even though we expected the complainant to testify that semen was sprayed throughout the room and testified out of court that this happened as many as 20 times, we felt that given the fact that there had been no crime scene forensic examination, the way to handle it would be to say, well, the police obviously didn't take this case seriously. Now, if we had known that there had been, in fact, a forensic detailed examination, we would have changed our strategy entirely. The opening statement would have been different. Instead of talking about sloppy police work, we would have praised the police. Okay, but opening statement we know is not evidence. It is not evidence, but it's strategy. Responding to the question of how this would have affected us. We would have conceivably saw our own exit. We would have taken pictures of the crime scene. We would have handled the cross-examination of the complainant in an entirely different fashion, nailing him down on where these incidents of masturbation occurred in the room, et cetera. All of this would have led to, you know, a detailed discussion attacking the credibility of the complainant. Now, the option to recall the complainant, let's face it, he's a very sympathetic witness. The last thing we wanted to do is present him to the jury again. The very last thing that I would have wanted to do was put this 11-year-old child in front of the jury. So, we lost our opportunity. We lost our opportunity. And let me say this, you know, at the trial level and also at the appellate level, the state has taken the position this is all Officer Easton's fault. That's not right. The state has an obligation here as well. I mean, it's hard to imagine a more flagrant violation of the discovery rules than a forensic examination of an alleged crime scene that turns out to be negative and it's not disclosed. Let me go back to one thing you said. You had talked about this would have affected how you attack the credibility of the complainant, but there was a confession here also. Correct. I mean, so. Well, you know, that's true. There was a confession. Now, let me say this about that. I certainly anticipated questions along these lines. I'm not intending to diminish anything about the conduct of the trial except to say this. As you know in our brief, we've raised the question of the confession. In the context of this, my client was interrogated for about two to two and a half hours shortly after his arrest. Part of that interrogation was supposed to have been recorded. The part that was intended by all the parties to dispel any doubts about what my client said and the questions he was asked. Now, the state argued below and they argued here that these were two separate statements. And therefore, the court ruled correctly in limiting, in only allowing the state to introduce the first part and not the second part. That's the state's contention. We respectfully would argue, as we have, that this was one solitary interrogation interrupted by a few brief minutes when the officer left the room supposedly to set up the audio system. Now, the second segment, which the state refers to, by the way, this was the second segment of the interrogation, was directly related to the subject matter of the first part of the interrogation. So in answer to Your Honor's question, we're not sure what the complete statement would have contained. We know this much, that Mr. Gambiani, the defendant, stated in the pretrial hearing that there were discrepancies and disagreements. Now, our hearing was months later. He's a young man who's never had any contact with the police in his life. You know, he was obviously nervous, unconscious. So he wasn't able to record what we call specific disagreements. So, yes, the part of the statement that the jury heard and the jury was permitted to hear was obviously a confession. That's true. And so I'm assuming you're asking the question in light of the materiality and whether it would have affected the outcome. Does that segue into your completeness document? Yes. You're saying that somehow that violated the completeness document? That's correct. That's what we argued below, and I apologize for the confusion that was rightfully pointed out by the statement there. Brief, if there's any confusion, our position is simply this. We believe the entire statement should have been excluded. It shouldn't matter whether the promise to record a statement happens at the beginning, the middle, or the latter part of a statement. If a promise is made to record a statement so that all questions about what is said have been dispelled, then if you can't keep that promise, the statement should be excluded. Well, how do you go back and record the statement that was made before the discussion took place? Just re-ask all the questions? You can't, but obviously you can't. Well, that's right. Re-ask all the questions. And were they re-asked? Did you tell me before this happened and that happened? Or did we discuss this? Tell me. Repeat again what your answers were. That's what the completeness doctrine is all about. And that's what would have been clarified here if the recording device had worked. Now, you know, again, I mean… Well, doesn't it go beyond the completeness doctrine? Because if you look at the completeness doctrine, as I understand, the purpose of the rule is to place the fragmented version that's in evidence into the proper context so the prior effect doesn't get misled. That's right. So the whole statement goes in. Yeah. What about the argument that the other side could make? Well, he actually gave a complete statement. The fact that it was never later reduced to an audio doesn't mean the first statement wasn't complete. How do you respond to that argument? I would respond to that by simply relying on what Officer Holtman indicated and what the purpose of the recording was, which was, let's clarify so that there are no misunderstandings. That's what he said. That's the word he used, no misunderstandings. So he wanted the recording to be part or parcel of the earlier interrogation that was only delayed by a matter of a few minutes and related to the same subject matter. That's what the rule of completeness is all about. We're not talking about asking Mr. Gambiani questions about some unrelated incident or some secondary incident. We're talking about the very same subject matter that was discussed earlier. And they started from the beginning, we know from the pretrial hearing, from going through the Miranda warnings all the way through. And on the video, you see Mr. Gambiani shaking his head, saying no. Now, that's what the rule of completeness, in my opinion, is all about. And I don't think the termination should be when the promise is made to record a statement if the subject matter doesn't change between beginning and end. That's the answer I would give to the court. But it is a rule of completeness argument. I have a question about the victim here. You said that as a matter of strategy, you really didn't want to put him back on the stand. During his initial testimony, was he straightforward? Did he break down? Did he cry in any way? It's hard to tell from the written word. I hear you. And I know you will have the video available to you. He's a very attractive-looking, sympathetic-looking young man. He was 11 years old at the time. He was very straightforward. He wasn't tearful. But in my respectful view, he was a good witness for the state. He was a good witness. There's no question about it. Now, his testimony between the video and when he testified to the court was contradictory on several key points, which led to some issues that we've raised here concerning the incidence or non-incidence of oral sex, for example. But, yeah, you know, the last thing that we wanted to do was have the jury see him again. Well, let's talk about the timing because that's one of the issues that you raised. You know, these indictments are phrased on or about. And while certainly it is hoped that we could get a much more specific, this is when it happened because this was the last day of school, and I remember we're putting it in some reference, isn't the case law pretty clear that the on or about is exactly that, on or about? It is the best recollection possible. And the jury hears that, and the jury hears argument that that's a problem because it couldn't have happened on that day because of this that was available to the jury. So why is it a problem here that could reverse this matter? Well, we pointed out that we were misled. That's a fair statement. I mean, there's no question we were misled. We were misled by the pretrial proceedings. We were misled when we reviewed the video because the date of June 7th, for example, was a date that stood out in everyone's minds. It was a date that there was a party. It was the day before the complainant reported the incident or incidence to his mother. So that was a significant date. It was significant to the state as well. If you note from our brief, we've highlighted the excerpts from the record where the prosecutor specifically directed the complainant's testimony to that date and led the witness about the incidence of oral sex on that day, which he repeatedly denied, which was inconsistent, admittedly, with his videotaped statement. So I would say this, Your Honor. If that were the only point here, I would agree with the court that the date might not be significant enough to cause you to think that that might have affected the verdicts. But we have to bear in mind that what also happened here was the court allowed non-specified other criminal acts to be introduced into evidence under 115-7-3, which is permitted in sex offense cases, and then refused an instruction, which we tendered, consistent with the Cardamone case, which would have required the jury to agree on the acts. So forget the fact – and by the way, the judge not only gave the 3.14 instruction. It's one thing to say the date isn't important. It's another thing to tell the jury that's the law when you also delete the dates from the indictment when it's submitted to the jury. And that's what happened here. At least the jury should have been informed of that fact. And so when you have the combination of – there's a question about what if anything happened and when it happened. The part about when it happened was completely taken away from the jury as being significant. I couldn't argue with that. As to this one date or other dates? Any dates. Any dates. Well, isn't that another way to – how do I say this? Isn't that another way to not confuse the jury so they're told what the acts are and then they match – I mean, this is one – they match the act to the testimony and was it proved beyond a reasonable doubt? Well, I'm not sure. You may proceed and finish. Okay. Your Honor, the best way I can answer this question is – and I have to be perfectly candid with you. Sometimes confusion is a good thing from the defense perspective. Usually when it neures to the defendant's benefit. That's correct. But here's the bottom line. Is it asking too much? Is it asking too much to require the jury to be specific about the acts they're relying upon? Isn't it a basic fundamental principle of American jurisprudence that a defendant receive notice of what he's charged with and be able to defend based on that fact and that the charge – that all 12 jurors agree on the underlying acts? Well, that certainly would be a preferable way of proceeding, but the question is does the case law hold that that's automatic reversible error if it's not done that way? Well, again, we're dealing in an area here where you're getting into the gray area, the difficult, problematical area of when you start admitting evidence of other crimes. Now you have charged and uncharged acts, and that's where the difficulty arises. If you eliminate the 7.3 problem, then you're just talking about charged acts and fine, any date. But now you've got uncharged acts in the equation, and it shouldn't matter whether it's 250 as in Cardamom or, you know, 5 to 10 or 100 if you look at the video images in this case. Counsel? Yes. Excuse me.  I'm sorry. It's all right. In regard to your other crimes evidence you had just talked about, one of the points you make in your brief is that the judge did not give the instruction at the appropriate time, but – and you contend that the judge should have given the instruction to the jury before the witness testified. However, I would like to know how does that square with the committee notes that go along with 3.14 which say that this instruction may be given both during trial, either just before or immediately after the jury is to hear the evidence in question, and they cite the case People v. Roe. So according to the committee notes, the judge acted appropriately. Well, according to the notes, yes, but let me say this, and I know that's been pointed out and argued by the state. Let me say this. That's fine as long as the other crimes are delineated, and it's hard to do that if you do it after the fact, and that's the whole purpose of this. So the jury understands there's a difference, that the defendant is not on trial for uncharged acts, and that's very, very difficult for a jury to appreciate that when at the conclusion of the complainant's entire testimony on direct examination, not just when he concluded the testimony about other acts, but after all his testimony is over, the judge tells the jury there was testimony about uncharged acts that relate to motive, intent, etc., etc., and you shouldn't consider those. Well, you know, I don't expect any jury to be able to appreciate what that means at that point in the trial. I know my time has run out, and I really had hoped to be able to talk a little bit about both the absence of evidence of anal penetration and the fact that the judge refused to instruct the jury on lesser-included offenses as to the predatory acts at counts 1, 3, and 4, despite the fact that there was no evidence. There are two possibilities. The State may raise them, and you'll have an opportunity to rebut, or we will rely on your brief. But at this point, we will let the State proceed. Okay. Thank you. Thank you very much. Ms. Smith? Good morning, Your Honors. Good morning. May it please the Court. I wanted to address some of the questions that have already come up, particularly the breeding violation. I just wanted to point out just a couple of things. One is that, on the record, counsel was asked what type of prejudice there could be when he didn't ask for a continuance, which he did not do. He could have asked the Court. We don't know whether it would have been granted or not, but certainly the Court seemed amenable to doing whatever it could to make sure that there was no prejudice to the defendant, despite what was clearly a mistake on the State's part. How many days had the proceedings been, before the jury, been pending at that time? I believe it was a couple of days. But the important part to that is that the only witnesses who had testified, I believe, were D.G., the victim. And specifically, the Court told defense counsel that he could call him back and cross-examine him, now that he knew of this information about the lack of semen. And then, also, the mother had testified, but she did not testify to any of the acts in that room, so it really did not have any relevance. But she's the one who caused the problem that ensued, essentially. That's right. By remembering something that, apparently, no one else had remembered. And what about counsel's argument that this is, at the time of these allegations, this child was about 10. Yes. By the time of trial, he was late in his 11th year, actually 12 years old. He said the strategy is not really to call the sympathetic witness back. Right. But in light of the fact that the jurors were told exactly what had happened, that there was evidence which defense counsel was unaware of, and this was the evidence, and it was the State's fault in not giving it to them, I think that any prejudice would be so minimal because, obviously, the defense's hands were tied somewhat to having to do that. And as counsel suggested – Well, the young man, as counsel has said, was very forthright. He was straightforward. Right. He was attractive. I think his words were attractive. Sympathetic witness didn't break down. Isn't there a risk that we bring him back? And that could happen. The breakdown could happen, and it could be a problem. Well, I suppose it could, but there was certainly nothing on this record to indicate that this child was, you know, the demeanor of this child was such that he would not do so. In fact, we also have the recorded statement of the child to the investigator, Investigator Easton, and, again, you can see the composure that this child has despite what's happened to him. And I believe that that's, you know, significant in terms of, you know, any type of claim that, you know, there was going to be a risk of prejudice should he be recalled. Isn't there a whole line of cases that say the right to meaningful representation of counsel extends to the ability to prepare for trial and develop a strategy consistent with the evidence rather than bootstrap theories necessitated by surprise developments? Absolutely. So how does that doctrine square with what happened here? Well, I don't think that it changed the defense theory really at all. The defense theory was that this statement made by this confession, made by the defendant in this case, was not to be believed because he was trying to, you know, in a very close family, trying to make amends and trying to move on, not to cause any problem. His defense was all along, I didn't do this, it didn't happen. Now we have extra evidence which, in fact, shows that the talk that there was, defendant ejaculated in D.G.'s room, this evidence actually supports the defense theory, can be used to their advantage, and certainly was used to their advantage, was brought up in the closing argument. But that's a recourse examination of the victim. That's the problem, isn't it? Well, the problem is that, again, they can, you know, I'm not saying that it's not a problem, but certainly I think under these circumstances where he was allowed to call the victim, the victim seemed very composed and was able to answer these questions. I don't think there was any true harm or prejudice such that it would be fundamentally unfair and, you know, would actually be an abuse of discretion here that a mistrial was not granted. Well, counsel indicated he would have gotten his own expert had he known pre-trial about this. Well, and that may be, I mean, there's no way for us to know exactly what would have happened, so I'm not going to suggest that that wouldn't have happened. But all I'm going to say to that is that the jurors were aware that this happened. Now, D.G. did, I think counsel said that D.G. did say in his first statement that this happened 20 times. But in court he said it happened two times, and he clarified that he had misunderstood the question when it was asked of him by the investigator, by Investigator Easton. And the defendant himself said this happened two or three times. So we're not talking about a great amount of times. We're talking about somebody who supposedly was laying on his back in the room and then I think asked D.G. to get something to help him, you know, to wipe up. There doesn't have to be any type of semen evidence in order for our case to be just as strong as it is. But certainly the fact that there wasn't any, was brought in by counsel, was argued in closing argument, and to the extent that they could have brought in their own expert who would have said, you know, yes, or not their own expert but maybe even the person who did this testing, yes, we tested, you know, in this area, that's about the only difference that could have been made in this case. I mean, they did get in front of the jurors that several swabs were taken. All of them were negative for semen. And how would that have affected the outcome? I don't believe it would have affected the outcome at all because you don't need that additional fiscal evidence. There's lots of reasons why that may not have been, there may not have been a semen on the carpeting, despite the fact that it's still going to happen exactly as D.G. suggested. And we have here a confession by a defendant. The defendant himself says that, I mean, he agrees that all these acts occurred in the number charged. And, you know, again, we have a continuous course of conduct. We have a child victim. We have no ability to distinguish necessarily between dates that these occurred on. They generally occurred in his room. They occurred just between the two of these people. There were always people in the home according to both the mother and D.G. And yet despite the fact that we cannot take each instance and say this is absolutely to be, you know, We have incredible evidence here. We have a very strong supporting statement by D.G. We have very strong and very minor inconsistencies really. Testimony in court, and then we have the defendant's own statement that, yes, he did this. And I do want to make one comment while I'm thinking about it. Defense counsel has said that he would like to bring up the lack of evidence on the anal penetration. But the defendant first said, I think it was Officer Holguin said that the defendant was asked was there anal penetration. This is after the defendant broke down and said, okay, I have done some bad acts and I'm willing to talk to you. And the defendant said yes when he was asked whether there was anal penetration. Then he said it might have lasted, I think, 10 or 15 seconds or 15 or 20 seconds, something of that sort, because it was uncomfortable and we stopped. But his testimony alone, sorry, excuse me, his statement alone is sufficient. And I know in the reply brief, counsel has brought up a corpus delicti argument. But in response to that, there is a recent case I saw just in the last few days, People v. Hurry, H-U-R-R-Y out of the 3rd District, which responds to that, which is exactly what I argued. That is, we have the confession plus we have DG's statements, which corroborate all this. So in the scheme of things, this would only be harmless error. Counsel, what is your response to opposing counsel's argument that in light of the Cardamone decision, the non-IPI unanimity instruction should have been given here because the jury might have been confused over the uncharged acts? What's your response to that argument? My response to that is Cardamone is a totally different case, and I'm not talking about just in terms of numbers of incidents. I'm talking in terms of instead of a continuous course of conduct type of other crimes evidence that we have here, where we say instead of it happening two times, it happened five times. There are no distinctive acts. As I've just said, there's nothing to change or to distinguish one act from another. This is very similar to the cases that I cited, and I believe that the Ledger case from this court actually has some of this in it, too. When you have a course of conduct where there's no distinguishing factor, you really end up with a jury that cannot distinguish and say it happened on this case, it didn't happen on this instance, it didn't happen on that. If they believe DG, if they believe the evidence in front of them, the credibility is only DG's. And they have the defendant's statement, then they believe it is to all the incidents. They don't believe it is just to one. Cardamone was very different. Cardamone had many, many different instances. And many different victims. Is that correct? A number of victims. And not only a number of victims, but the number of victims goes into the other crimes because then they brought in details of those other crimes. They brought in details that these occurred in all different places, which would make some more believable than others. And they also, obviously the jurors could find that in this instance, this witness was credible, but in this instance, this witness was not. We have one person whose credibility is at issue, that's DG, and we have a defendant's confession. These incidents really were, other crimes' evidence was really no detail. It was, or almost no detail. It was really this act of penetration or this act of sexual contact occurred, it occurred this many times. So to divvy that up in some manner and say, well, this first charge, this one time is what's charged and these two times are not, is impossible. And that's the continuous course of conduct type of case that I've cited in my brief. What about the confession issue? In terms of what, I'm sorry? The recording versus the not recording the promise. Oh, the promise doctrine? Yes. I have to say that I think under what counsel is espousing here and in his brief, what he's really saying is that any time you take a complete statement, then you're required to go back, record it, and allow them to make clarification. That's just not the law. Well, what does a complete statement mean? If you make a promise that we'll record it, what does that mean? Well, if you make a promise, which didn't happen here, that's the Moore case. If you say to begin with, before the statement is made, I'm going to be recording this, then you better record it. But the first statement was not made under those circumstances. And it is a complete statement because the defendant was never told, we're going to take this statement, then you'll get your chance to clarify. There was nothing to tell the defendant, hold on to any thoughts you have or any misinterpretations or clarifications. To a later point, we'll get to that. Your argument, in essence, is the completeness document really doesn't apply. That's correct. It doesn't. This is really a complete statement by itself. Then there was an additional act where I believe it was Investigator Hogan offered to take another statement with the recording. And that obviously did not turn out. But that has no effect on the first statement. How do we know? I mean, this is chicken, egg, and things. How do we know it's not a complete statement? Or how do we know it is a complete statement if we don't have the other one? If we don't have the other one? The recorded statement. Well, that's like saying how do we know that this is a complete statement when we don't have a second statement to reiterate or to, you know, to go over questions again. Well, if we didn't, we did not. But in this case, they specifically said, okay, would you like to do this? Yes, I would. And they start, and it doesn't work. Again, no fault, but it just doesn't work. But I think it comes back to the fact that that was not a promise at the beginning where a defendant withheld any information. He thought, and could have likely been, you know, they're going to ask me a question, I'm going to answer it. We may never go back to it, so I'm going to say what I'm going to say. Why would he have thought that? He didn't. The record is pretty clear. He doesn't have any real police contact of significant nature beforehand where he's being questioned for an hour or two hours. I mean, this is pretty new to him. Well, because any person being asked to, you know, such questions as was there anal penetration knows that when the investigator goes on to the next question, that that is your answer, that there's no giving, you know, unless you say, wait a minute, stop, I need to clarify or something, which he didn't do. So we have this total statement in terms of here's the question, here's what I answered, here's the next question. At some point, in all police interviews, they're going to say, okay, we've got what we need, thank you very much, and we're done. That's what happened here. And at that point he did not say, well, wait a minute, you know, I mean, they said, we've got what we need, now we'd like to ask you, will you agree to go back over? And that's important, too. They ask him, can we go back over what you've said now and we'll put it on recording just so that there's no mistake. But until that point, until that point that that was said, he thought that this is his complete answer. And I think that's the key difference between this and something like the Moore case. Were there any lesser included instructions given in this case? There was on the anal penetration, but there wasn't on the other two. I just want to make one comment on that. First of all, again, there's not a disputed element. We have the defendant's confession to all of these things. And in terms of, again, it's only when we go back to making the DG testify as to a particular date and making the evidence go to June 7th, which I believe is absolutely incorrect for the reasons I stated in my brief, that we can then say, okay, we have this act which was not an act of oral sex. But, again, we are not stuck with June 7th. We are looking at on or about. We have instances where we know that, in fact, during this course of conduct, there was oral sex. In terms of this particular date, even if we say that only fondling or only touching occurred, that does not mean under the circumstances here that they would be entitled to lesser included because this is two different acts. He said he tickled my genitals or he tickled my testicles and, oh, in his statement to the investigator, and, oh, also, there was oral sex. These are different acts. This is like so when he gets on trial and says, in fact, that oral sex acts did not occur, I think that the jurors would be, of course, allowed to say, well, then we're acquitting on that if, in fact, there had not been other evidence of it, which there was. But it's not a lesser included. It's not a matter of one element that's in dispute between the two. All right. Thank you, Counsel. Thank you. We would ask this Court, then, to affirm his convictions and offenses. Thank you. Thank you, Madam Judge. Yes, you have some rebuttal. Yes, I'm going to be very brief. Let me say this real quickly about the state's solution to the very serious, extremely serious, in my view, brain violation that occurred in the trial level. Yes, we were able to point our finger at Officer Easton and say, you're a bad cop, or you dropped the ball, or you didn't do what you were supposed to do. But that didn't lead to guilt or innocence. That didn't solve the problem. Well, how would then sloppy, if your basic premise was sloppy police work, how does that solve, you know, if that was your strategy, walking in the door without the information, how were you predicting this with the information? The premise we were going on, it wasn't sloppy police work. It was an inference to be drawn that if they were crediting the complainant's description of what happened, they would have investigated the crime scene. That's the distinction that we were making. You didn't do sloppy, though, the first time around when you argued? I know I didn't then. Okay. So the jury was to believe the police? If the police believed the child, then the jury was to believe the child? Well, not necessarily. Go ahead. I can't go over the minds of the jurors, but it was a point where, you know, an incident is reported, what do the police do? They do nothing. And that is a factor for the jury to consider, yes. I would say it is a factor for the jury to consider, that the police didn't follow up, didn't take the allegation seriously, did not do what you would expect normal police work to be, which would be to go to the scene of the alleged occurrence and see if there's any evidence, forensically speaking, which we believe did not happen here. And that was our strategy. Now, was it the bell ringer? Not necessarily, but it was a factor in our discussion. Now, the counterpoint is we would have centered a major portion of our defense on the lack of forensic evidence in the crime scene. That's what we would have done, and we would have prevented from doing that. I want to mention something about this statement issue because it's of concern to all of us, I would hope. You know, immediately before the defendant was arrested, there was an overhear conducted by the complainant's father, who was my client's uncle, pursuant to a court order in which my client was asked certain questions. Immediately before the search warrant was executed, it's referred to in the people's brief. And during that conversation, essentially, the defendant denied, denied any wrongdoing, although he made statements that were not exactly complementary as far as his character was concerned, which is why we wanted to exclude it. But in response to the overall picture of what this entire statement would have revealed if it had been available, minutes before he was arrested, he denied doing anything bad. The state says there are minor inconsistencies here. I don't get that point. In his video statement on June 18th, the complainant says oral sex occurred on June 7th. At trial, he's adamantly denying that. Adamantly denying that and saying tickling. That is not a minor inconsistency. That's a major inconsistency. But by saying tickling, the state, you see, that's the point. That's criminal sexual abuse. That's a class two. Tickling is a class two. The state says it's all or nothing. Well, it wasn't all or nothing, and we're entitled to our theory of defense, and we're entitled to argue even if there's slight evidence. So you wanted the instruction on tickling? Criminal sexual abuse. Okay. And if you look at the testimony of the health care givers, and if you look at the testimony of the complainant, and if you look at the statement that Mr. Gambiani made, the record contains instances where all of the testimony says that there was touching. And People v. Creamer stands for that proposition without a doubt. Well, if we're not confusing, we're going back to this theory, if we're not going to confuse the jury with specific dates, and you say that the dates are wiped out, you know, when they look at the indictment, if there was only one incident of touching slash tickling, that would be a problem. But, again, don't we have alleged many? Yes. And many are charged. That's right. And that should have been one is charged. That was one criminal sexual abuse that was charged. But the point is, that should have been an option for the jury to consider as to all of the predatories. That should have been an option, and the judge unreasonably denied that to us. I want to say one other thing about the anal, you know, the questions and statements. If you look at the case we cited, our reply to People v. Lambert, where there's a confession, there's evidence of pinkish discoloration and swelling around the anal area. And the court says, the Illinois Supreme Court says that's not enough. That's not enough. And the only time that the complainant was asked a specific question of whether there was anal contact, he said no. So, I'm out of time. If you have any more questions, otherwise, appreciate the opportunity to address the court. Thank you very much. Thank you, counsel, for your arguments in this matter. We will take it under advisement. We will render a decision in due course. We'll stand in recess for about ten minutes, and thank you very much.